UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK KENNEDY,

            Petitioner,

    v.

J. GASTELLO, Warden,

           Respondent.

Case No. 16-cv-01686-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

## I.  INTRODUCTION

Petitioner Mark Kennedy, a state prisoner, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2012 conviction and sentence stemming from a physical altercation with Lester Chow on August 11, 2010 "after he discovered Chow and Emmalyn Munjar—[Petitioner's] former or then current girlfriend, depending on whether you ask him or her—in bed together." *People v. Kennedy*, No. A137227, 2014 WL 7183288, *1 (Cal. Ct. App. Dec. 17, 2014).

On February 9, 2011, the San Francisco County District Attorney filed an eight-count information charging Petitioner with attempted murder, two counts of assault with force likely to cause great bodily injury, battery with serious bodily injury, two counts of false imprisonment, criminal threats, and domestic violence.  Resp't Ex. 1, 1 Clerk's Transcript ("CT") 77-80.  The information also alleged great bodily injury allegations.  1 CT 77-80.  On January 17, 2012, during Petitioner's first trial, the San Francisco County jury acquitted him of attempted murder and the lesser included offense of attempted voluntary manslaughter, criminal threats, domestic violence, and one count of assault with force likely to produce great bodily injury.  2 CT 320, 322-23, 327-29, 331-32, 334-35.  The jury was unable to reach a verdict on the remaining counts, on which the trial court declared a mistrial.  2 CT 335-337.

On May 15, 2012, the San Francisco District Attorney filed a first amended information charging Petitioner with the four counts in which a mistrial had been declared: assault with force

likely to produce great bodily injury (count one); battery with serious bodily injury (count two); and two counts of false imprisonment (counts three and four). 2 CT 391-92. It also alleged great bodily injury enhancements in connection with counts one and three. 2 CT 391-92. The information also alleged that Petitioner had sustained three prior prison convictions and two prior prison terms. 2 CT 393-94.

On May 25, 2012, the jury reached a verdict during Petitioner's second trial and convicted him of assaulting, battering, and falsely imprisoning Chow with great bodily injury enhancements (counts one through three). 2 CT 504-509; Resp't Ex. 3, 16 Reporter's Transcript ("RT") 3445-3451. The jury acquitted Petitioner of false imprisonment of Munjar (count four). 16 RT 3445-3451. Petitioner waived his right to a jury trial on the priors. 2 CT 510; 11 RT 2616. On November 16, 2012, the trial court found true the first alleged prior conviction, a 1996 violation of California Penal Code § 245(a)(2) in Solano County, but found the other two prior convictions not true. 2 CT 544; 17 RT 3549-3550. The parties stipulated that the prison prior allegations were invalid, and they were stricken. 2 CT 544; 17 RT 3549-3550.

On November 16, 2012, the trial court sentenced Petitioner to sixteen years in state prison. 2 CT 544-547; 17 RT 3570-3574.

The operative petition is the amended petition, in which Petitioner raises the following claims: (1) the prosecutor's presentation of allegedly false testimony from Munjar and the grant of immunity from perjury violated Petitioner's due process right to a fair trial (Claim 1); (2) the trial court erred in refusing to instruct on the defense-of-others doctrine (Claim 2); (3) the evidence was insufficient to support the sentence enhancement for great bodily injury (Claim 3); and (4) ineffective assistance of counsel ("IAC") claims based on his trial counsel's (a) failure to investigate and present evidence relating to the extent of Chow's injuries (Claim 5), and (b) failure to object to an "illegal sentence" at sentencing (Claim 6). *See* Dkt. 20 at 5-6.[1]

Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the petition for the reasons set forth below.

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

2

## II.    BACKGROUND

### A.    Factual Background

The California Court of Appeal summarized the facts of Petitioner's offense as follows. This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

> It is undisputed that the charges against defendant stemmed from an incident in the early morning hours of August 11, 2010, when he went to an apartment where Munjar lived, discovered her in bed with Chow, and engaged in a physical altercation with Chow that left Chow injured. What actually happened leading up to and during the assault, however, was the subject of conflicting accounts by Munjar, who told differing versions to the investigating police officers, at the preliminary hearing, and at two trials.[FN 1] The inconsistencies in her stories are relevant here, so we detail her testimony at the preliminary hearing and the first trial, and the pertinent evidence at the second trial.
>
> [FN 1:] As will be detailed below, the first trial of defendant resulted in acquittals on four charges and a mistrial on four others. The convictions that are the subject of this appeal resulted from the retrial on the four remaining charges.
>
> **Munjar's Testimony at the Preliminary Hearing**
>
> Munjar and defendant began a relationship in 2006 and were living together until April 2010. Munjar ended their relationship on May 8, 2010, and defendant was not very happy about it. She told him numerous times she did not want to see him again, but he continued to pursue a relationship. She did not tell him when she became involved with Chow.
>
> In August 2010, Munjar lived in an apartment at 501 Masonic Avenue. Defendant had a key to her apartment, which she had given him in June, and he had been to her apartment three times.
>
> On August 10, Munjar visited defendant at his home. Later that evening, they were exchanging texts, and he asked how she was doing. According to Munjar, "I said, it's not very good, because my niece just died. And I'm alone. And mostly he will comfort me when I—and I probably texted him that I will see you, but not this moment."
>
> Around 1:50 a.m. the following morning, August 11, Munjar was asleep in bed with Chow when she was awakened by arguing and fighting between defendant and Chow. The light was off so she could not really see defendant. Defendant jumped on top of her and Chow, and began punching Chow while yelling, "[W]hat are you doing to my girlfriend?" Chow and Munjar both ended up on the floor, and defendant started shaking Munjar by her nightgown, asking her why she was with Chow. She pushed him and tried to get away, while telling him, "You are not supposed to be here." At some point during the incident, Munjar's nightgown came off, although she was

3

unaware of when or how.

Munjar heard what sounded like footsteps and then the police were outside, shouting for the door to be opened. Munjar last saw defendant at the bedroom window and suspected he probably jumped out.

Munjar suffered a cut on her lip, which she believed occurred when defendant accidently hit her during his fight with Chow. She testified that she did not remember defendant applying any pressure to her neck, although a photo taken after the incident reflected an injury on the right side of her neck.

On cross-examination, Munjar testified that she remembered being questioned by the police after the incident, but that she was given medication that affected her memory and she did not understand all of the questions she was asked. Throughout the entire interview, she did not really know what she was saying. Munjar remembered telling the officer it was dark and she could not see defendant hitting Chow. She also told him that during the fight, she heard defendant yell out, "cheaters."

Munjar also testified on cross-examination that when she was texting with defendant the night before the incident, she told him she was feeling sad and wanted to be alone. Chow was already there, and she did not expect defendant to come over.

**Charges Against Defendant**

On February 9, 2011, the San Francisco District Attorney filed an information charging defendant with the following eight offenses: (1) attempted murder of Chow (Pen. Code, § 664/187, subd. (a) [FN 2]); (2) assault on Chow with force likely to cause great bodily injury (§ 245, subd. (a)(1)); (3) battery of Chow with serious bodily injury (§ 243, subd. (d)); (4) false imprisonment of Chow (§ 236); (5) making criminal threats against Chow (§ 422); (6) domestic violence against Munjar (§ 273.5, subd. (a)); (7) assault on Munjar with force likely to cause great bodily injury (§ 245, subd. (a)(1)); and (8) false imprisonment of Munjar (§ 236). The information also alleged a number of enhancements, including, as pertinent here, great bodily injury enhancements on the first four counts.

[FN 2:] All statutory references are to the Penal Code.

**Munjar's Testimony at the First Trial**

Evidence in defendant's first trial commenced on January 6, 2012. Munjar testified as follows:

Munjar and defendant started dating in 2006, and she ended their relationship on May 8, 2010. Her relationship with Chow began in July 2010, and she and her children moved into the Masonic Avenue apartment that same month. At that point, Munjar had a working relationship with defendant, but that was it. According to Munjar, she told defendant in "May and June and every time he call [ed]" that she was seeing someone else, although she did not identify Chow by

4

name. She testified that prior to the incident, defendant had never been to her apartment, she had not told him she was living there, and she had "no idea" how he knew she lived there. She claimed she had not given him a key to the apartment.

On August 10, Munjar went to a house in Oakland that she was renting and where defendant had moved after the two split up. She brought rent money and had sex with defendant, although they were not involved in a relationship. She returned to the Masonic Avenue apartment that afternoon, around the same time that she learned her niece had died in a motorcycle accident.

Munjar went to bed late that night, and was awakened by a loud noise. She was unable to move her body because defendant was sitting on top of her and Chow as they lay next to each other on the bed. Defendant had his hand around her neck, making it hard to breathe or speak. She heard defendant saying, "You shut up motherfucker. I'll kill you." It was "really, really dark" so she could only see defendant's shadow. She could hear him hitting Chow, punching him on the left side of his head and face "a lot" of times, "[m]ore than ten." Defendant also punched Munjar "[p]robably four times," hitting her on her left upper lip and the left side of her neck. During the assault, Munjar was kicking her legs and trying to push defendant off of her.

Defendant finally stopped hitting Chow because he was no longer moving, dropping him on the floor and turning his attention to Munjar. He grabbed her off the bed by the throat and started hitting her chest, repeatedly yelling, "I'll kill you. I hate you."

Chow started crawling on the floor, and defendant jumped up and grabbed him by his neck. Munjar stumbled to her feet, attempting to run away and yelling, "help, help, help." Defendant grabbed her by her neck, threatening to kill her if she did not shut up. At some point, Munjar began yelling out the names of her children, and defendant released her and resumed his attack on Chow, this time kicking him while he was on the floor.

Munjar heard sirens and the sound of footsteps approaching. Chow was able to get to the door and open it, letting the police in. Munjar saw defendant standing in the bedroom, and then he was gone. According to Munjar, she was naked when the police arrived, and a female police officer helped her put on a dress. She had been wearing a nightgown when first attacked by defendant, and had no idea when or how it came off.

Following the assault, Munjar's mouth was full of blood and her hands were covered in blood. She also had abrasions on her neck, chest, and lower right leg. She and Chow were transported to the hospital, where she received stitches in her left, upper lip. She also needed a throat x-ray because she was unable to talk. Munjar testified that at the time of trial, her voice was still not the same as before and she had difficulty swallowing.

Between the August 2010 incident and the January 2011 preliminary hearing, Munjar accepted "a lot"—"more than 20"—collect calls from defendant. He also sent her letters. In the calls and letters,

defendant asked that she and Chow not testify against him.

On cross-examination, Munjar acknowledged that in April 2009, she rented a house in Oakland to use for a marijuana dispensary business she owned. According to Munjar, she told her landlord, Lucy Chiang, that she was renting the house for herself, and that she might transfer "stuff"—medical marijuana—from the clinic to the house. She denied telling Chiang that she would be moving into the house with her two daughters because she wanted to get away from the marijuana business.

Munjar also acknowledged that defendant worked and lived at the Oakland house. According to Munjar, she only went to the Oakland house when she needed to pay the rent. She admitted having had sex with defendant once at the house, claiming it was the only way defendant would let her leave. She denied having an ongoing sexual relationship with defendant up until his arrest, testifying she had no relationship with him after May 8.

Munjar admitted that in December 2010 (four months after the incident), she met with a police officer—Inspector Antonio Flores, whose testimony is detailed below—because she wanted to correct some of the information she had given him when he interviewed her right after the assault. According to Munjar, she had given him false information during the prior interview because Chow was in the next room and she did not want him to hear the truth, that she had had sex with defendant the day before the incident.

Munjar also claimed she lied at the preliminary hearing when she testified that she was awakened by noise and shouting. She acknowledged that while she testified at trial that she heard defendant say, "[S]hut up, mother fucker. I will kill you," she had testified at the preliminary hearing that she heard him say, "[W]hat are you doing to my girlfriend?" She also admitted she lied when she previously testified she had given defendant a key.

Munjar denied that on the evening before the incident she responded to any texts from defendant or that she texted him her niece had died, and that her daughter ever spoke to defendant when he called from jail. Records produced by defense counsel contradicted her testimony, however. Finally, Munjar acknowledged telling Inspector Flores she could not remember if she had sex with Chow the evening of the incident because she was too intoxicated, but she claimed that by the time of trial, she remembered they did not have sex that night.

**Jury Verdict in the First Trial and the Amended Information**

The jury found defendant not guilty of attempted murder of Chow, making a criminal threat, domestic violence against Munjar, and assault on Munjar with force likely to produce great bodily injury. It was unable to reach a verdict on the remaining counts, however, and the court declared a mistrial on those four charges.

On May 16, 2012, an amended information charged defendant with the four remaining counts, namely, assault on Chow with force likely to cause great bodily injury, battery on Chow with serious bodily

injury, false imprisonment of Chow, and false imprisonment of Munjar. It again alleged a great bodily injury enhancement on the first three counts, among other special allegations.

### Evidence at the Second Trial

Defendant's second trial commenced on May 16, 2012. Prior to the start of trial, defense counsel moved to dismiss the complaint based on Munjar's alleged perjury during the first trial. Although the court denied the motion, the prosecutor acknowledged his duty to point out inconsistencies in Munjar's testimony.

The pertinent evidence at the second trial was as follows, beginning with Munjar's testimony:

Munjar dated defendant from the beginning of 2006 until April 18, 2010, during which time they lived together. After she broke up with him on April 18, she continued to see him, mostly because they worked together in her retail marijuana dispensary business. She broke up with him for the final time in May. Around that time, she arranged for him to move into a house in Oakland that she rented for use in her marijuana business.

Although it was unclear when Munjar's romantic relationship with Chow began, in the first week of July 2010, Munjar and her two children moved into Chow's apartment at 501 Masonic Avenue, although Munjar claimed Chow did not live there fulltime. According to Munjar, she had not told defendant where she lived, he had never been to her apartment, and she had not given him a key. She admitted having testified at the preliminary hearing that she had given defendant a key to the apartment, but she claimed she had testified falsely because she was frightened.

On August 10, Munjar went over to the Oakland house to drop off the rent, and she and defendant had sex. Although she initially denied having had any contact with defendant after April 18, 2010, she admitted having sex with him on that one occasion. When further questioned, she said she was unsure how many times she had sex with him between April and August 2010.

Munjar left defendant's house around 5:00 p.m., arriving at her apartment about a half an hour later. He texted her after she left, but she testified at trial she did not remember if she texted him back. When the prosecutor showed her a string of texts, Munjar recalled she had texted defendant that her niece had died in a motorcycle accident.

Around 7:00 p.m. that evening, Munjar and Chow drank some alcoholic beverages, smoked marijuana, and took sleeping pills. They went to sleep around 9:00 p.m., Munjar wearing a nightgown and Chow wearing bedclothes.

At some point between 1:30 a.m. and 1:58 a.m. the following morning, Munjar awoke in a darkened bedroom to discover defendant "very heavy right on top of [her] stomach," while also pinning Chow down on the bed next to her. He had his left hand around Munjar's neck, choking her and making it very hard to breathe, while he

punched Chow with his right fist. Defendant was telling Chow, "I will kill you, motherfucker. Shut up, motherfucker. I will kill you." Munjar tried to talk, but defendant responded by choking her harder.

Munjar testified that at no time during the assault did she see Chow and defendant involved in a fistfight. When asked by the prosecutor if she recalled testifying during the preliminary hearing that when she woke up, she saw defendant and Chow engaged in a fight, Munjar acknowledged having so testified, but claimed it was not true. She also testified that she "did not really hear" defendant say, "[W]hat are you doing to my girlfriend?", as she had testified at the preliminary hearing. When asked why she testified falsely, Munjar responded that she had been frightened defendant would be punished.

According to Munjar, she passed out at some point, and when she came to, defendant was still choking her. She began calling out her daughters' names and begging defendant, "Don't kill us. Don't kill us." At the sound of her children's names, defendant stopped choking her.

Defendant finally stood up and dragged Munjar off the bed by the front of her nightgown. With his hand around her neck, he threw her against the wall and lifted her off the ground. He was yelling at her, "Why you fucking him? Why did you fuck him?" Munjar was flailing her arms and legs but was unable to speak. At some point between defendant pulling her off the bed and throwing her up against the wall, Munjar's nightgown came off.

Chow, who had been on the floor not moving, started crawling, so defendant dropped Munjar, turned around, and started kicking Chow in his stomach and face. Munjar screamed, "Don't kill him. Don't kill us. Don't kill us," while banging the floor.

Defendant turned his attention to Munjar again, pulling her by her hair and hitting her head into a coffee table three or four times. Munjar finally heard a siren and then footsteps nearing the apartment. Chow crawled to the apartment door and opened it, letting the police in. Munjar had remained in the bedroom and saw defendant jump out the window. The next thing she knew, she was at the hospital, where she stayed for the day.

According to Munjar, she suffered a cut on her lip and bruises on both sides of her neck and chest, and had difficulty eating for a while.

At trial, the prosecutor played a sampling of recordings of telephone calls—56 calls totaling 548 minutes—Munjar received from defendant while he was incarcerated after the incident. In the calls, defendant made incriminating statements about the attack, and also asked Munjar not to testify against him and to change the story of what happened to portray it as mutual combat. She also let him speak to her children, because they had lived together for three and a half years and he cared about her daughters.

At the end of Munjar's direct examination, the proceeding was paused. Outside the presence of the jury, the court asked Munjar if she was testifying truthfully in light of the inconsistencies with her

prior testimony. After Munjar took the Fifth, the prosecutor granted her immunity from prosecution for perjury committed at the preliminary hearing and the first trial, later extending it to false statements she made to the police.

Munjar was then subjected to a scathing cross-examination by defendant's counsel, during which she admitted telling numerous lies to the police and at the preliminary hearing and first trial. She claimed she was just doing what defendant wanted her to do, stating, "Whatever Mark wanted me to say, that's what I did."

Defense counsel solicited the following inconsistencies in Munjar's testimony:

At the preliminary hearing, Munjar testified that the first thing she noticed was noise and shouting, followed by fighting, but at the second trial she testified she awoke to find defendant on top of her, choking her.

Munjar previously testified that defendant said, "[W]hat are you doing to my girlfriend?" and that he and Chow were both fighting, whereas this time, she testified that defendant yelled, "I'll kill you. I hate you," and that it was not mutual combat between defendant and Chow.

Munjar testified at the preliminary hearing that defendant had been to her house two or three times, but this time she testified he had never been to the apartment.

Munjar acknowledged her prior testimony that her lip was cut when defendant was fighting with Chow and he accidentally hit her. She claimed it was a lie because defendant had asked her to say it was mutual combat.

At the preliminary hearing and the first trial, Munjar testified that on the night before the incident, defendant texted her but she never texted him back. That testimony was then contradicted by records introduced during her direct examination. When asked if it was now her testimony that she did in fact text him back, Munjar responded, "I took a sleeping pill that night. I was drunk, too. So I really don't know if I text him or not."

At the first trial, Munjar testified her daughter never talked to defendant while he was in jail, but a recording had established otherwise. In this trial, Munjar changed her testimony and acknowledged the conversation.

Munjar acknowledged telling a police officer who responded to the scene that defendant was yelling, "[W]hat are you doing to my girlfriend?" when he entered the bedroom. She admitted lying to the officer, however, claiming he had actually said, "Motherfucker, shut up, motherfucker or I'll kill you."

Munjar did not recall telling Inspector Antonio Flores shortly after the incident that defendant did not assault her, that she did not see how Chow was injured because the room was dark, that she had not

9

blacked out, and that she had not had sex with defendant the day before. She admitted telling Inspector Flores that defendant called her and Chow cheaters and that she had had no contact with defendant since April 18, 2010. She did not remember telling him that she did not hear defendant say he was going to kill her or Chow.

Munjar admitted telling Inspector Flores in December 2010 that she had lied about having given defendant a key to her apartment because she did not want him to get in trouble for burglary. She had also lied to him about seeing defendant and having sex with him on August 10.

Munjar acknowledged that her testimony on direct examination was the first time she had told anyone that defendant lifted her up and held her against the wall with her feet off the ground.

Munjar testified that on August 9, she sent defendant a text telling him to fuck off. Defense counsel contradicted her with a record showing that on the night of August 9, she texted him, "Fuck you tomorrow." Munjar acknowledged that the next day, she went to defendant's house and had sex with him.

Munjar acknowledged she had been renting a house in Oakland that she used for a marijuana grow. According to Munjar, she told the landlord she worked in the medical marijuana industry and was looking for a place to have her patient members grow, and "she basically agreed." Defendant then moved into the house and started to tend the grow, delivering items, cleaning up, and so forth. When asked if Chiang agreed the house could be used for a marijuana grow, Munjar responded, "She knows what I do."

Munjar did not recall testifying at the preliminary hearing that defendant had not put pressure on her neck.

Munjar acknowledged she had texted defendant that her niece had died and that she believed he would want to come over and comfort her.

When asked why Munjar was purportedly telling the truth at that trial when she had not before, Munjar responded, "My mind is more clearer now. No one is telling me this is what you need to do, this is what you have to do. I am more stronger now to speak the truth."

Chow was the second witness to testify. According to him, he initially met Munjar at a marijuana club in 2008 and got to know her in December 2009. Her marijuana club was experiencing financial difficulties, and he loaned her $5,000. In December 2009, he went with her to a house in Oakland that she was interested in renting. In June 2010, their relationship turned sexual.

Chow owned an apartment building at 501 Masonic Avenue and had lived in one of the units for four to five years. Munjar moved in with him in mid-July 2010, about a month prior to the incident. On the evening of August 10, they were home, both depressed over deaths in their families. He consumed two alcoholic drinks, took a sleeping pill and medication for Parkinson's disease, and smoked marijuana. They had sex, and he went to sleep around 12:30 a.m. the following

morning. He was later awakened by a noise, and he looked up to see defendant in the doorway of his bedroom. Before he could get up, defendant was pinning him down by his chest. Chow asked, "What are you doing here?", and defendant responded, "Shut up, motherfucker. I'll kill you." Defendant began punching him in the face and choking him. He recalled being punched "six, seven, eight" times and choked "three or four times." Chow testified that he lost consciousness, although he told the paramedic and hospital personnel that he had not lost consciousness and testified at the preliminary hearing that he was "almost semi unconscious."

Defendant also had Munjar pinned on the bed next to him, with his left hand on her neck. She was screaming, "Stop it, stop it." The next thing he knew, he was on the floor. Defendant was still on the bed with his hand on Munjar's neck, but he then turned his attention to Chow, who was crawling on the ground. Defendant kicked Chow approximately 20 times in his chest, stomach, and legs, "all over my body." According to Chow, while he was on the bed, he was wearing a t-shirt and boxer shorts, but when he came to on the floor, he was not wearing any clothes.

At some point, Chow heard sirens and someone knocking on the door, so he crawled over and opened it, letting the police in. Chow testified that defendant was no longer in the apartment when the police came in, but he did not see where he had gone. He acknowledged having testified in the first trial that he saw defendant leave through the window, but he did not know why he gave that testimony.

Paramedics arrived shortly after, and Chow was taken to the hospital, where he stayed until late morning. According to Chow, he suffered throat problems that made it hard to talk and breathe, stitches on both lips and his left eyebrow, and his left eye was swollen shut. He experienced problems with his left eye, including blurriness, that persisted at the time of trial. He also had bruising on his right bicep and chest, and abrasions on his nose and right knee and above and below his right eye.

Peter Ballotta, who lived directly below Chow's apartment, testified that around 1:30 a.m. on August 11, he was awakened by someone ringing his doorbell. Shortly after, he heard what sounded like someone hop the back fence, walk through the backyard, and enter the building through the back door. Ten minutes later, he heard an argument in the apartment above him. At first, he heard a man and woman yelling at each other, but then it sounded like a fight had started and a woman was "crying, screaming." At some point, he heard a male voice saying, "Are you fucking him?" The fighting escalated and "it sounded like furniture was moving or something had fallen over or there was people banging on things," so he called the property manager and then 911.

Multiple officers responded. Once in the building, they could hear a man and a woman yelling and sounding upset. As they got closer to Chow's apartment, they could hear something moving inside and then "a loud commotion inside, fighting, screaming" and "a loud smacking sound" like someone being struck. They knocked a few times, and when no one responded, they tried to force entry, and eventually

Chow opened the door. He was naked and covered in blood, with his face "split open" and lots of swelling, including his left eye that was swollen shut. Munjar was standing behind him, also covered in blood. Multiple officers testified that Munjar was clothed when the door was opened.

Munjar and Chow were out of breath and had a difficult time explaining what had happened. According to one of the officers, Munjar said that defendant had attacked them. Chow told the officers that they were in bed when they were awakened by defendant walking into the bedroom. He approached them, climbed on the bed, and alternated between punching him and Munjar.

Two other officers who responded to the scene were pulling up outside the apartment building when they saw defendant run out, cross the street, and get into a van. They detained him, observing that he had cuts on his hands, his pants were torn, and he was disheveled. Defendant was still there when Chow was wheeled out of the apartment building and into an ambulance, and defendant said, "Do you know what it's like finding out your girlfriend of four years is cheating on you after you had sex with her?" Defendant was arrested and transported to the police station.

According to forensic nurse practitioner Diana Emerson, who testified as an expert for the prosecution, when Chow first arrived at the hospital, he was treated for respiratory distress and given Albuterol and oxygen. Emerson acknowledged that Chow's respiratory problems could have been due to asthma. He also suffered multiple injuries to his face, neck, and body. His neck was discolored—almost black—all the way down to his chest wall, and was so swollen his larynx and trachea were not visible. She described Chow's neck injuries as "a significant strangulation injury."

Chow also suffered a left orbital blowout fracture, meaning the lower and side parts of the eye socket were shattered. There were bone fragments in the muscle, and muscle trapped within the bone fragments. His left eye was swollen shut. He received stitches in his left eyebrow, as well as his upper lip. His nose was broken, and he had multiple abrasions and swelling elsewhere on his face, elbow, knees, and hands. He also had red marks on his back that were from ruptured capillaries, consistent with pressure having been applied to Chow's chest.

The emergency room doctors recommended Chow be admitted because there was a risk he could suffer airway compromise resulting in death as a result of his strangulation injuries, and left eye blindness due to the orbital fracture, but he left the hospital against their advice after about seven hours.

Meanwhile, defendant had been transported to the police station. As an officer was conducting a booking search, defendant spontaneously said he was sorry he had lost it and he had been in a fistfight because his girlfriend was cheating on him. He also said, "My girlfriend was fucking that guy, and she's only fucking him because he has money."

Later that same morning, when officers were in the process of taking

12

photographs of defendant and samples of the blood on his body, defendant stated, "Why are you going to do that? I already told them I was guilty." He went on to say that his girlfriend was cheating on him and that the boyfriend charged him and he beat him up, repeating it several times and "just rambl[ing] on about it."

Inspector Flores, who was in charge of the investigation, also testified. According to the inspector, he interviewed Munjar and Chow at the hospital on the morning of the assault. According to the inspector, Chow had "multiple bruises on his neck and on his face and on his hands" and appeared to be in "[a] lot of pain." He also had a mask on and was having a hard time breathing, but they were able to communicate. Chow told him that he and Munjar, who were in a relationship, were in bed when all of a sudden defendant was choking, punching, and kicking him, and he saw defendant hit Munjar twice on the chin, and grab her by the throat and throw her on the floor.

That same day, Inspector Flores went to the police station where defendant was being held. He read defendant his Miranda [FN 3] rights, and defendant declined to talk to him. As he was taking photographs of defendant, defendant, who was "emotional," "crying," "upset," spontaneously made the following statement:

[FN 3:] *Miranda v. Arizona* (1966) 394 U.S. 436.

"What happened was, she met that dude and that dude was putting all his money in her shop. And they were like . . . they were just . . . he was just putting all this money in her shop because her shop was going under. And then she . . . it was like she never wanted me to work. She wanted me to work inside the place. And she didn't want me to go nowhere. So I was working hard. And then by the time she does that, she tells me you know 'you need to leave' and all that kind of stuff after . . . because this dude's telling her to tell him to leave. And then behind his back she's still coming to see me, and we're seeing each other and stuff, but I didn't know they were messing around. And then she gave me the keys to the house and then I come over there, I buzz in first, and when I buzz in first, then I went upstairs . . . somebody buzzing me in. So I go upstairs and then the door was unlocked . . . so I coming right in. I knocked first and the door comes unlocked. And then I come right in, and when I turn the lights on, then they in bed fucking. Or just got finished fucking and then he gets up hella quick and then he starts talking shit. And then I say, 'What the fuck!' And he's like talking shit, 'Fuck you . . . lalalala!' And then I just said, 'fuck it,' and just hit him. And I hit him like four or five times. And I was wrong. I was wrong. I don't have to . . . I'm not going to sit here and wait and get a lawyer and all that other . . . I was wrong for what I did. I should have been a bigger man and walked away. But it was so hard, and my emotions were getting to me. I smoked some herb, and I was drinking before I got there. And then after that, I was just feeling . . . thinking we would be all cool when I come in the house. And I see this, it's not wrong . . . it's not right. And we have a groove together, and it's like, she's spending more time with me over here doing all this. And then she says she just needs space. Then she's giving me mixed messages. And then she's telling me to come over, and then she's coming over here, and then we're all good. Then all of a sudden from there, this happens. I mean

13

what would you do if you saw your wife screwing some dude. Or, just got done screwing some dude, and they laying in bed together and he gets up starting to talk crap to you, and you all start fighting. Yeah, he's going to probably say, 'Oh, umm, I didn't do anything,' or whatever. They gonna lie their way out. I'm not gonna lie my way out. I'm gonna tell the truth. I'm gonna tell the truth about everything, because I ain't got no reason to lie.

". . . But I did wrong. I don't care if they said he didn't do anything . . . everything cool. I did wrong. And if I have to go to jail for it and face my punishment then I have to do it, because why? I did wrong on my part. I let . . . as they say in the bible . . . I let the devil win. I did. Because you know, I could have been the bigger man and walk away, but it was so hard. I have an anger issue. And I feel like I did wrong. I did wrong. . . . After I did what I did. After I let, lose my cool. I lost my cool. And I'm sorry and I'm wrong. And if you guys want to prosecute me, then you guys gotta do what you all gotta do. That's the law. And I don't disrespect the law, but that's the law and what I did is wrong according to the law."

Two days after the incident, Inspector Flores reinterviewed Chow and Munjar at the Masonic Avenue apartment. During that interview, Munjar told him the following: She lived at 501 Masonic Avenue with her children, and Chow would sometimes spend the night. Her relationship with defendant was over by that time. The night of the incident, she and Chow were in bed and were awakened by defendant climbing on top of them. Defendant's left hand was on her neck but he was not squeezing it, and he was holding Chow by the neck with his right hand. She did not see defendant hit Chow because it was dark, nor did she hear any hits to Chow's body. She did not hear defendant say he was going to kill her or Chow. She never lost consciousness when defendant had his hand on her neck, and she denied that defendant assaulted her. She said the cut on her lip was due to defendant choking her, claiming he had not punched her. According to the inspector, Munjar never told him defendant hit her head against a coffee table or picked her up by the neck, held her against the wall, and dropped her.

Munjar told Inspector Flores she had ended her relationship with defendant, had had no contact with him since April 18, and had never given him her address. She did not see defendant or have sex with him on August 10. She went to Oakland to pay her rent, returned to San Francisco, met with Chow to have lunch around 5:00 p.m. and stayed with him for the rest of the day. Munjar also told the inspector that around 8:00 p.m. she received a message from defendant asking, "Where are you? Are you seeing somebody?" She did not contact defendant and tell him to come over that night. She denied she had sex with Chow that night.

Inspector Flores also met with Munjar on December 14, 2010, at her request. She told him she had previously lied to him because Chow was in the apartment and she did not want him to know the truth. She admitted that the day before the incident, she had had sex with defendant at the rental house in Oakland. That night, she and Chow were depressed about family members and they smoked marijuana and started drinking a lot. She took a sleeping pill. She could not

remember if she had sex with Chow because she was intoxicated. She told the inspector she texted defendant on August 10, "Don't bother me, I will probably see you tomorrow," and she knew that he would reach out to her and come see her. According to Munjar's text records, however, on the night of August 9, she texted defendant, "Fuck you tomorrow." And the following evening, she sent him two texts about the death of her niece. Munjar also told Inspector Flores she had not given defendant a key to the apartment, contradicting her prior statements that she had in fact given him one.

The defense called two witnesses to impeach Munjar's testimony. The first, Lucy Chiang, was the owner of the house Munjar rented in Oakland. She testified that Munjar told her she owned a marijuana club in San Francisco and was looking for a quiet place for her and her two daughters to live away from the club and her ex-husband. She did not tell Chiang she wanted to grow marijuana at the house. After the lease ended, Chiang found the house "totally destroyed. Everything is ruined. All the floor is bad. Water damage. All the wall . . . It's all the little holes on the wall." The electrical system had also been altered.

The second witness, Wayne Richards, described a fender bender he and his daughter were involved in when Munjar, who was alone in her car, ran a red light and hit their car. Munjar filed a lawsuit against the Richards family, producing Chow as a supposedly independent witness who claimed he saw Richards's daughter cause the accident. The case was ultimately dismissed.

**Jury Verdict in the Second Trial**

On May 25, 2012, a jury found defendant guilty of assault with force likely to cause great bodily injury upon Chow (count 1), battery resulting in serious bodily injury of Chow (count 2), and felony false imprisonment of Chow (count 3), and found true the great bodily injury enhancements. It acquitted him of misdemeanor and felony false imprisonment of Munjar.

*Kennedy*, 2014 WL 7183288, *1-11 (footnotes in original and brackets added).

## B.  Procedural History

### 1.  Sentencing

On November 16, 2012, the trial court sentenced petitioner to sixteen years in state prison: eight years on count one, three years for the associated enhancement, and five years for the prior conviction; sentences on counts two and three were stayed. 2 CT 544-547; 17 RT 3570-3574.

### 2.  Post-Conviction Appeals, Collateral Attacks, and Federal Court Proceedings

Petitioner timely appealed the judgment to the California Court of Appeal on December 4, 2012. Resp't Ex. 5. In a published, reasoned decision issued on December 17, 2014, the

California Court of Appeal affirmed the judgment of conviction. *Kennedy*, 2014 WL 7183288,

*18; Resp't Ex. 8. On March 11, 2015, the California Supreme Court denied review. Resp't Ex. 9

On April 4, 2016, Petitioner filed the instant federal habeas action, initially raising only

Claims 1 to 3. Dkt. 1.

On June 9, 2016, the Court granted his request for a stay to exhaust additional claims in

state court pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005). Dkt. 11.

On or about May 15, 2016, Petitioner filed a state habeas petition in San Francisco County

Superior Court. *See* Dkt. 20-2 at 5. On July 6, 2016, the state superior court denied relief without

prejudice, finding that Petitioner had failed to support his IAC claims of trial or appellate counsel

with any evidence, citing *People v. Duvall*, 9 Cal. 4th 464, 474 (1995). *Id.*, Dkt. 20-2 at 112. On

September 28, 2016, Petitioner filed an amended petition with exhibits in superior court. *Id.*, Dkt.

20-2 at 11. However, the state superior court apparently did not rule on that petition.[2]

On March 30, 2017, Petitioner filed a state habeas petition in the California Court of

Appeal. Resp't Ex. 11. On April 18, 2017, the state appellate court denied the petition, finding

that the record Petitioner provided was inadequate to substantiate his claims against counsel and

that the medical evidence adduced at trial amply proved the severity of Chow's injuries, citing *Ex*

*Parte Swain*, 34 Cal. 2d 300 (1949). *See* Dkt. 20-2 at 4.

On May 18, 2017, Petitioner filed a state habeas petition in the California Supreme Court.

Resp't Ex. 12. On August 9, 2017, the state supreme court denied the petition as untimely, citing

*In re Robbins*, 18 Cal. 4th 770, 780 (1998). *See* Dkt. 20-2 at 2.

On September 25, 2017, Petitioner filed his first amended petition in the instant matter

raising his original three claims (Claims 1-3) and his IAC claims (Claims 4-5). Dkt. 20. On

October 11, 2017, the Court lifted the stay and ordered Respondent to show cause why the

amended petition should not be granted. Dkt. 22. On December 1, 2017, Respondent filed an

Answer and Memorandum of Points and Authorities in support thereof. Dkts. 24, 24-1. On May

---

[2] According to Respondent's counsel, the state superior court clerk reviewed the trial court file and informed counsel that there was no second order addressing the amended petition. Dkt. 24-1 at 9, fn. 1.

United States District Court
Northern District of California

1, 2018, after being granted two extensions of time to do so, Petitioner filed a Traverse. Dkt. 30.

On May 9, 2018, Respondent filed a reply to the Traverse regarding the procedural default of

Claims 4-5. The matter is fully briefed and ripe for adjudication.

## III. LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground

that he is in custody in violation of the Constitution or laws or treaties of the United States." 28

U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

a district court may not grant a petition challenging a state conviction or sentence on the basis of a

claim that was reviewed on the merits in state court unless the state court's adjudication of the

claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong

applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v.

Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

### A. 28 U.S.C. § 2254(d)(1)

To determine whether a state court ruling was "contrary to" or involved an "unreasonable

application" of federal law under subsection (d)(1), the Court must first identify the "clearly

established Federal law," if any, that governs the sufficiency of the claims on habeas review.

"Clearly established" federal law consists of the holdings of the United States Supreme Court

which existed at the time the petitioner's state court conviction became final. *Williams v. Taylor*,

529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme

Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme

Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."

*Williams*, 529 U.S. at 405-406. "Under the 'unreasonable application' clause, a federal habeas

court may grant the writ if the state court identifies the correct governing legal principle from [the

17

Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, the Court reviews the last "reasoned decision" by the state court. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

As explained above, Petitioner raised his first three claims (Claims 1-3) on direct appeal. Therefore, the last reasoned decision as to Petitioner's claims of (1) instructional error, (2) prosecutorial misconduct and (3) insufficiency of the evidence is the California Court of Appeal's unpublished disposition issued on December 17, 2014. *See Kennedy*, 2014 WL 7183288, *11-18.

Meanwhile, no reasoned decision exists on Petitioner's IAC claims (Claims 4-5), which were summarily denied by the California Supreme Court on August 9, 2017. *See* Dkt. 20-2 at 2.

**B. 28 U.S.C. § 2254(d)(2) and (e)(1)**

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record. *Taylor v. Maddox*, 366 F.3d 992, 1005 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014). A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption of correctness applies to express and implied findings of fact by both trial and appellate courts. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *see Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On habeas review, state appellate court findings—including those that interpret unclear or ambiguous trial court ruling—are entitled to the same presumption of correctness that we afford trial court findings.").

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court. *See Taylor*, 366 F.3d at 999-1000. In *Taylor*, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1). *Id.* First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2). *Id.* at 1000. The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings. *Id.* Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by addressing the state court finding of a presumption of correctness under § 2254(e)(1). *Id.* According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error. *See* 28 U.S.C. § 2254(e)(1). "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in

19

the 'unreasonable determination' standard of section 2254(d)(2)." *Taylor*, 366 F.3d at 1000.

If constitutional error is found, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

## IV.    DISCUSSION

### A.    Procedurally Defaulted Claims (Claims 4 and 5)

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 728 (1991).  Thus, where a state court's rejection of a claim rests upon an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." *Noltie v. Peterson*, 9 F.3d 802, 804-05 (9th Cir. 1993).

Here, Petitioner presented Claims 4 through 5 in his state habeas petition, which was rejected by the California Supreme Court on August 9, 2017 as follows: "The petition for writ of habeas corpus is denied.  (See *In re Robbins* (1998) 18 Cal. 4th 770, 780 [courts will not entertain habeas corpus claims that are untimely].)"  Doc. 20-2 at 2.  "A summary denial citing . . . *Robbins* means that the petition is rejected as untimely." *Walker v. Martin*, 562 U.S. 307, 313 (2011).  As Respondent correctly points out, the denial of habeas relief by the California Supreme Court on the ground that the petition was untimely is considered an independent and adequate state procedural ground requiring denial of subsequent habeas petitions in federal court. *See* Dkt. 24-1 at 44 (citing *Walker*, 562 U.S. at 317-320; *Duran v. Beard*, 2017 U.S. App. LEXIS 20305, *2 (9th Cir. 2017).  As such, the Court finds that Respondent has adequately pled the existence of an independent and adequate state procedural ground as a defense. *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir. 2003).  In view of that initial showing, the burden shifts to Petitioner to demonstrate that the procedural rule was not independent or adequate. *Id.*  Petitioner fails to

satisfy this burden.  He likewise has failed to demonstrate cause and prejudice to excuse the

default.  Instead, in his traverse Petitioner attempts to oppose procedural default by stating that the

untimely state habeas petition was the result of "government interference," because took three

months for him to receive a response from the superior court on his amended petition, and because

he did not have access to his legal property for a month and a half when he was transferred to a

different prison and his classification was being processed.  Dkt. 30 at 40-43.  However,

Respondent points out that even though Petitioner attempted to explain the reason for his delay,

the California Supreme Court rejected his reasons and found that the state habeas petition filed on

May 18, 2017 was untimely.  *See* Dkt. 20-2 at 2.  In reply to the traverse, Respondent asserts that a

federal court may not revisit the issue of whether the procedural bar was properly imposed

because it is a question of state law.  Dkt. 31 at 2.  Respondent is correct.  The Supreme Court has

repeatedly held that federal habeas writ is unavailable for violations of state law or for alleged

error in the interpretation or application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68

(1991); *see, e.g.*, *Little v. Crawford*, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme

court misapplied state law or departed from its earlier decisions does not provide a ground for

habeas relief).

Accordingly, the Court finds that Claims 4 and 5 (Petitioner's IAC claims) are

procedurally defaulted for purposes of federal habeas review.

### B.  Remaining Non-Defaulted Claims

#### 1.  Instructional Error (Claim 1)

Petitioner argues that the trial court violated his due process rights by failing to instruct on

defense of others.  Dkt. 20 at 5.

#### a.  State Court Opinion

The state appellate court rejected Claim 1 upon determining that no due process violation

occurred as the result of omitting an instruction for a defense that was not supported by the

evidence, and that any error was harmless.  *Kennedy*, 2014 WL 7183288, *11-14.  The following

excerpt taken from the state court's opinion includes the background, applicable law, and

discussion relating to Claim 1:

In defendant's first argument, he contends the trial court deprived him of his right to due process by failing to instruct the jury on the defense of others. As he would have it, the evidence showed that when he entered the apartment, he reasonably believed Chow was unlawfully touching Munjar and would continue to do so if he did not intervene. Despite this evidence, which he claims was "virtually identical" to that elicited at the first trial and which merited a defense of others instruction at that trial, the trial court denied his request for a defense of others instruction at the second trial. The argument lacks merit.

**A. Background**

As given at defendant's first trial, CALCRIM No. 3470 provides:

"Defense of others is a defense to attempted murder, and offenses involving assault, battery, battery involving serious bodily injury, and lesser offenses as to Lester Chow. The defendant is not guilty of those crimes if he used force against the other person in lawful defense of another. The defendant acted in lawful defense of another if:

"1. The defendant reasonably believed that he or someone else was in imminent danger of being touched unlawfully;

"2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger;

"AND

"3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to someone else. Defendant's belief must have been reasonable and he must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful defense of another.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death/bodily injury has passed. This is so even if safety could have been achieved by retreating.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense or defense of

another.  If the People have not met this burden, you must find the defendant not guilty of these offenses." [FN 4]

[FN 4:]   The court also instructed as a component of the simple assault, battery causing serious bodily injury, and simple battery charges involving Chow that the jury must find defendant not guilty if it found he acted in defense of someone else.

In the second trial, counsel for defendant requested a similar defense of others instruction, explaining, "I think in the previous trial of this matter, the instruction was given, and in this trial it should be given, as well, and the reason being that when Mr. Kennedy is to have entered this apartment, the lights were off.  [¶]  He saw two figures appear to be involved in having sex.  One was his girlfriend, as far as he knew."  This exchange ensued:

"THE COURT:  What's our evidence of that?  [¶]  I know that's the defense theory, but what's the evidence they were having sex?

"MS. KAPLAN [DEFENSE COUNSEL]:  The statement introduced by Mr. Delgado.

"MR. DELGADO [PROSECUTOR]:  He did state in the statement they either had sex or just finished having sex.

"MS. KAPLAN:  That as far as he knew, from everything she told him, she was living alone, that she essentially had invited him over by talking about deaths in her family, knowing he would want to comfort her based on his four-year relationship with her, that he had sex with her the day before.

"There has been nothing that happened between the two of them that indicated that they did not have a continuing relationship and that when he began what is described by the district attorney as assaultive behavior, it was, in fact, in defense of Ms. Munjar, who he believed to be his girlfriend, being sexually assaulted by another.  [¶] . . .

"MR. DELGADO:  We just don't have any evidence saying he thought that she was in any danger.  [¶]  His statement was that Mr. Chow had ambushed him.  There is no evidence he was trying to defend her.

"THE COURT: I don't think we have that evidence, and I think we have the evidence that Mr. Ballotta said, 'Are you fucking him,' which sort of goes against him defending another.  [¶]  In any event, I don't think there is evidence of defense of another, but there's enough evidence that I do believe the self-defense instruction is warranted."

The court subsequently instructed the jury on self-defense without the defense of others language.

**B.  Applicable Law and Standard of Review**

The trial court must give an instruction when "there was substantial evidence presented which would warrant the giving of the instruction.

[Citation.] A jury instruction need not be given whenever any evidence is presented, no matter how weak. [Citation.] Rather, the accused must present 'evidence sufficient to deserve consideration by the jury, i.e., evidence from which a jury composed of reasonable men could have concluded that the particular facts underlying the instruction did exist.'" (*People v. Strozier* (1993) 20 Cal. App. 4th 55, 62-63; *see also People v. Salas* (2006) 37 Cal. 4th 967, 982-983 ["defendant has a right to have the trial court . . . give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant"]; *People v. Michaels* (2002) 28 Cal. 4th 486, 529 [court must instruct on all material issues presented by the evidence, including affirmative defenses such as a self-defense and defense of others].)

We review the trial court's decision not to give a requested instruction under the de novo standard of review. (*People v. Manriquez* (2005) 37 Cal. 4th 547, 581, 584.) We conclude that the record here does not contain substantial evidence to support the requested instruction.

## C. Discussion

Defendant's request for the defense of others instruction was based on his statement to Inspector Flores the day of the incident. As he describes it in his opening brief, "During the recorded rambling remarks made by appellant at the police station, appellant stated that he came over to the Masonic Street apartment in response to Munjar's messages inviting him, that he expected to find Munjar alone but instead, saw a male having sex with her, and that he construed what he had seen as an act of unlawful touching committed against Munjar. [Citation.] According to appellant, Chow then jumped up quickly and started 'talking shit' and 'they all just start[ed] fighting.'" This account takes great liberty with what defendant said to Inspector Flores.

In the referenced portion of the statement, defendant actually said this: "So I go upstairs and then the door was unlocked . . . so I coming right in. I knocked first and the door comes unlocked. And then I come right in, and when I turn the lights on, then they in bed fucking. Or just got finished fucking and then he gets up hella quick and then he starts talking shit. And then I say, 'What the fuck!' And he's like talking shit, 'Fuck you . . . lalalala!' And then I just said, 'fuck it' and just hit him. And I hit him like four or five times. And I was wrong, I was wrong . . . ." This passage is hardly evidence—let alone substantial evidence—that defendant assaulted Chow because he believed Munjar was imminent danger of harm from him. And nothing else in defendant's statement can be construed as a claim that he acted in defense of Munjar. To the contrary: it is replete with acknowledgments by defendant that he assaulted Chow because, upon entering the apartment and discovering Munjar in bed with Chow, he realized she was sleeping with someone else.

Defendant also claims circumstantial evidence mandated the giving of the instruction. According to him, the evidence "demonstrated that appellant had been induced to come to the Masonic Street apartment by Munjar's texts to him describing her distress at the death of her

24

niece. As Munjar admitted, she knew that appellant would 'reach out' to comfort her and would likely appear because that was his habitual reaction to her signals to him. [Citation.] She had represented to appellant that she lived alone and had never warned him not to come over. In fact, she had given him a key to the apartment. [Citation.] Appellant understood that she was implicitly inviting him over that night through her text messages invoking her emotional neediness. [Citation.] Appellant and Munjar had just had sex earlier that day, and appellant believed theirs was an ongoing and exclusive relationship. [Citation.] In the context of his understanding of the situation, which was fostered by Munjar's acts and statements, appellant believed that Munjar—who, by her own admission, was rendered essentially unconscious by the combination of Ambien, marijuana and alcohol she had ingested prior to going to sleep . . . would not have invited him over had she planned to have sex with Chow. Appellant therefore reasonably understood what he saw as Munjar being unlawfully touched by Chow and reasonably believed that she would continue to be unlawfully touched were he not to defend her against that danger." The flaws in this theory are many.

First, Munjar testified at the second trial that she had not in fact given defendant a key and that she had broken up with him months before, repeatedly telling him she was seeing someone else. Thus, defendant's scenario conflicts with the evidence presented at the second trial. Additionally, there was extensive direct evidence that defendant did not think Chow was assaulting Munjar, including defendant's many incriminating statements, Chow's description of the incident, and Ballotta's testimony that he heard a man yell, "Are you fucking him?" Further, the evidence indicated that both Chow and Munjar were asleep when defendant entered the bedroom, which undermines defendant's claim that he thought Munjar was in imminent danger. Indeed, defense counsel argued in closing argument that Chow and Munjar were in a "drug induced, drunken sleep" when defendant entered the bedroom. And in making this very argument, defendant himself represents that Munjar was "rendered essentially unconscious by the combination of Ambien, marijuana and alcohol she had ingested prior to going to sleep." In light of all this, we cannot conclude that defendant's claimed circumstantial evidence was sufficient for a reasonable jury to find that defendant acted in defense of Munjar.

In a final word on this issue, we note that defendant's claim that the evidence at the second trial was "virtually identical" to the evidence at the first trial directly conflicts with his claim that Munjar told contradictory accounts at the two trials. And she did in fact give conflicting testimony on facts relevant to this issue. For example, at the first trial, she testified that she was awakened by defendant and Chow fighting; at the second, she testified she woke up to find defendant pinning both her and Chow to the bed and punching or choking them. At the first trial, she testified defendant yelled, "[W]hat are you doing to my girlfriend?"; at the second, she testified that defendant yelled, "[S]hut up, motherfucker. I'll kill you." While the testimony at the first trial may have constituted substantial evidence warranting a defense of others instruction, no such testimony was offered in the second trial.

**D. Harmless Error**

> Even if we were to conclude the court erred in failing to instruct on defense of others, such error would have been harmless. (*People v. Randle* (2005) 35 Cal. 4th 987, 1003 [error in failing to instruct on defense of others is state law error subject to *Watson* analysis].) As detailed above, the evidence was overwhelming that defendant's assault on Chow was motivated by defendant's discovery of Munjar in bed with another man. It thus cannot be said that it was reasonably probable defendant would have obtained a more favorable result had the court given a defense of others instruction. (*See People v. Watson* (1956) 46 Cal. 2d 818, 836 [conviction of the charged offense may be reversed only if it appears from the record reasonably probable the defendant would have obtained a more favorable result].)

*Id.*

### b.    Applicable Federal Law

To obtain federal habeas relief for an error in the jury instructions, a petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. "Even if there is some 'ambiguity, inconsistency, or deficiency' in [a jury] instruction, such an error does not necessarily constitute a due process violation." *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (1977)). "Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington*, 555 U.S. at 190-91 (quoting *Estelle*, 502 U.S. at 72 (internal quotation marks and citation omitted); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right].'").

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).

If a constitutional error is found in the jury instructions, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. *Calderon*

1  v. *Coleman*, 525 U.S. 141, 146-47 (1998).  The habeas court must apply the harmless-error test set

2  forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a

3  "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Hedgpeth v.*

4  *Pulido*, 555 U.S. at 58 (quoting *Brecht*, 507 U.S. at 623).

### c.      Analysis

6          When, as here, the state court has found the error harmless, relief is not available for the

7  error "unless the harmlessness determination itself was unreasonable."  *Davis v. Ayala*, 135 S. Ct.

8  2187, 2199 (2015) (emphasis in original).  In other words, a federal court may grant relief only if

9  the state court's harmlessness determination "was so lacking in justification that there was an error

10  well understood and comprehended in existing law beyond any possibility for fairminded

11  disagreement."  *Id.* (quoting *Harrington*, 562 U.S. at 103).

12          The California Court of Appeal's rejection of the federal constitutional claim was not

13  contrary to or an unreasonable application of clearly established federal law.  Assuming arguendo

14  the trial court's failure to instruct the jury on defense of others instruction amounted to a federal

15  constitutional violation, the state appellate court's harmlessness determination was not

16  unreasonable.

17          The California Court of Appeal reasonably determined that, based on the overwhelming

18  evidence that the assault on Chow was motivated by Petitioner's discovery of Munjar in bed with

19  another man, it was not reasonably probable that Petitioner would have obtained a more favorable

20  result had the court given a defense of others instruction.  *Kennedy*, 2014 WL 7183288, *14.

21  Respondent argues that "[n]o reasonable jury would have concluded that Petitioner actually

22  believed Munjar was in any danger . . . ."  Dkt. 24-1 at 37-38.  The Court agrees.  The state

23  appellate court reasonably determined that the record was "replete with acknowledgments by

24  [Petitioner] that he assaulted Chow because, upon entering the apartment and discovering Munjar

25  in bed with Chow, he realized she was sleeping with someone else."  *Kennedy*, 2014 WL

26  7183288, *13.  Munjar's neighbor testified that he heard a male voice repeatedly yell out, "[A]re

27  you fucking him?"  15 RT 2824-2830.  Contrary to Petitioner's claim that he needed to act because

28  Chow posed a threat to Munjar, Chow testified that he and Munjar were sleeping when Petitioner

United States District Court
Northern District of California

entered the room.  12 RT 2665-66, 2744-45; 14 RT 3057-58.  Furthermore, Petitioner's statements to police that he "lost it" when he saw Munjar in bed with another man, *see* 15 RT 3181-86, contradicted a defense of others theory.  Even if the jury did believe that Petitioner initiated the assault on Chow in order to defend Munjar, Petitioner's attack on Chow would have failed to qualify as a defense of others because California law only permits resistance "sufficient to prevent the offense."  Cal. Penal Code § 694.  As indicated above, the defense of others instruction expressly states as follows: "The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the defendant did not act in lawful defense of another."  *Kennedy*, 2014 WL 7183288, *11.  Finally, the record shows that the jury found true the enhancement allegation that Petitioner inflicted great bodily injury on Chow, *see* 2 CT 504-509, which contradicts Petitioner's claim that his actions constituted lawful defense of others.

Accordingly, it was not unreasonable for the state appellate court to determine that any error resulting from the trial court's failure to instruct the jury on defense of others instruction was harmless.  Petitioner has failed to show that the state appellate court's harmlessness determination was itself unreasonable, *see Davis*, 135 S. Ct. at 2199, and therefore he is not entitled to habeas relief on Claim 1.

### 2.    Prosecutorial Misconduct (Claim 2)

In Claim 2, Petitioner claims that the prosecutor's presentation of allegedly false testimony from Munjar and the grant of immunity from perjury violated Petitioner's due process right to a fair trial.  Dkt. 20 at 5.

### a.    State Court Opinion

The state appellate court reasonably concluded that no due process violation occurred, given that the prosecutor fully acknowledged inconsistencies that he should have known to be actually false and that any lies that went uncorrected were immaterial.  *See Kennedy*, 2014 WL 7183288, *14-17.  The state appellate court resolved this claim as follows:

### A.    Applicable Law

In an oft-quoted passage, the United States Supreme Court in *Napue*

28

*v. Illinois* (1959) 360 U.S. 264, 270, addressed the State's use of false testimony: "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. [Citations.] The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. [Citations.] [¶] The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." The court went on to explain that a prosecutor "'has the responsibility and duty to correct what he [or she] knows to be false and elicit the truth. . . .'" (*Ibid.*) The California Supreme Court has likewise acknowledged this prosecutorial obligation. (*People v. Harrison* (2005) 35 Cal. 4th 208, 242 ["'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents . . . .'"].)

## B. Background

Prior to the commencement of the second trial, defendant moved for dismissal of the case based on inconsistent testimony by Chow and Munjar. The court agreed that Munjar had lied in her prior testimony but disagreed as to Chow. Counsel for defendant responded, "I think they're really liars, to really cut to the chase, and I think the problem is that in the initial trial, the prosecutor is aware that there are different statements, and that's not unusual, as the court has said, but after the first trial, I think, given the state of the evidence that Mr. Kennedy should not be prosecuted based on that testimony, those witnesses and that state of the evidence, it is wrong, and therefore, I'm asking that the case be dismissed."

The prosecutor disagreed that dismissal was proper, objecting that he did not knowingly suborn perjury. He acknowledged his duty to point out the inconsistencies in Munjar's testimony if he did call her to testify in the second trial.

The court denied the motion to dismiss, observing that the prosecutor understood his duty to correct any false statements or inconsistencies.

During the prosecution's case in chief, Munjar offered testimony that conflicted with her prior testimony. When the court asked if she had told the truth during her testimony at the preliminary hearing and the first trial, she took the Fifth. Munjar was then granted immunity from prosecution for perjury arising out of her prior testimony, although the court made it clear that if she committed perjury in that proceeding, she could be prosecuted.

Following the close of testimony, defense counsel once again unsuccessfully moved for dismissal, urging that the grant of immunity to Munjar was an improper license for her to commit further perjury, thereby denying defendant his constitutional right to a fair trial.

## C. Discussion

We understand defendant's argument to essentially be two-fold. First, he contends the prosecutor committed misconduct by knowingly suborning Munjar's perjury at the second trial. Second, he contends the prosecutor failed to fulfill his obligation to alert the jury to inconsistencies in Munjar's testimony.

As to defendant's first argument, it cannot be disputed that Munjar offered conflicting accounts to the police, at the preliminary hearing, and at the first and second trials. From this, defendant concludes she was necessarily lying at the second trial. But the fact is, other than instances where Munjar's testimony was contradicted by telephone and text records, we have no way of knowing what testimony was truthful. It could be that her early versions were false, such that her testimony at the second trial was the truth. Indeed, Munjar testified at the second trial she lied previously because defendant asked her to and she was afraid, she did not want him to get in trouble, and she did not want Chow to find out she had had sex with defendant the day before the incident. The record thus does not support defendant's claim that Munjar's conflicting testimony at the second trial necessarily constituted perjury. We therefore must reject his allegation that the prosecutor knowingly suborned Munjar's perjury by calling her as a witness at the second trial.

The question, then, is whether the prosecutor fulfilled his duty to identify the inconsistencies in Munjar's testimony. We conclude he did.

We first note that despite defendant's complaint "the district attorney failed to make any mention of Munjar's repeated perjured statements" or that he "did not point out falsehoods," defendant is hard pressed to identify the supposed material lies the prosecutor did not correct. In his opening brief, defendant references Munjar's "perjured statements [ ]regarding texting with [defendant], as one example[ ]." And in his reply brief, he claims the prosecutor did not discuss the following lies that were relevant to Munjar's testimony: "incidents involving her landlady, Lucy [Chiang]; a car accident in which she falsified the facts and alleged she was the victim, while Chow perjuriously presented himself as a disinterested eyewitness; the texts that she lied about sending; the sexual encounter she denied having; the relatives she claimed had died but hadn't, and many others." Most of these—e.g., the landlord, the car accident—are simply examples of other witnesses offering testimony contradicting that of Munjar. In such a case, the jury is simply free to believe whichever witness it finds more credible. (*People v. Montes* (2014) 58 Cal. 4th 809, 835 [matters of credibility are for the jury to decide]; *People v. Gordon* (1973) 10 Cal. 3d 460, 474["[T]he jury could decide for itself which of the conflicting versions of the incidents in question was true."].) As to the texts Munjar denied sending and the sexual encounter she denied having, those issues were in fact brought to the jury's attention during the trial.

Moreover, defense counsel subjected Munjar to a withering cross-examination that thoroughly painted her as a liar. We detailed above

the numerous inconsistencies defense counsel brought out, and we need not repeat them here. Suffice to say, the jury was thoroughly informed about the numerous contradictions in Munjar's testimony.

Additionally, during closing arguments, both the prosecutor and defense counsel extensively addressed Munjar's inconsistent testimony. The prosecutor first had this to say:

"We'll talk briefly about Ms. Munjar.

"It's not pretty. It's pretty bad when you have to give someone immunity right on the stand about previous lies that they told at previous hearings.

"Now, you'll have to weigh her testimony as your experience as you decide. There is plenty.

"We sat through all of this to impeach to just say Ms. Munjar is not a credible person when it comes to this particular event because she's told so many different versions of what happened.

"Each version has something like, you know, 'I gave him the key' and 'I didn't.'

"'The Lights were on. No, they were off.'

"'I didn't see what happened. But no, I heard, but I did see because the lights were on.'

"'I didn't have sex with him. I did.'

"'I didn't text him. No, actually I did.'

"I mean, it goes back and forth, back and forth.

"I just want to put that out that Mr. Kennedy called her, at least called her 56 times from the county jail asking her to alter the testimony, and she did it.

"January 28, 2010, she came down here and testified in front of Honorable Judge Chan, and she tried to help Mr. Kennedy. She tried to paint it as mutual combat.

"She tried to say that she gave him a key, even though . . . he's trying to get her to deliver a key to him.

"These were all lies, and the question is why would she do that."

Defense counsel's closing argument mentioned many of Munjar's specific inconsistencies, and also emphatically argued, "[S]he can't stop herself because she is a liar. That's what she is. Morning til night, she is a liar."

And in the prosecutor's closing rebuttal, he again emphasized Munjar's lies:

"The question was why was Ms. Munjar brought here. Why was she given immunity. Why would you put on such tainted evidence.

"One, in all intents and purposes, it's almost like she is a defense witness, because that's what their case is based on. [¶]['] She tells so many lies and has done things so inconsistent with what a reasonable person would do that this whole case should be thrown out.[']

"It even got to the point where counsel started referring to Lester and Ms. Munjar as 'they,' they lied, they set Mr. Kennedy up. [¶] . . .

"I understand that you in some way want to have all the facts as much as you can get because we're asking you to make an important decision here today, and that's why she was brought here. [¶] . . .

"Her credibility unfortunately is shot. She's given so many different answers. [¶] . . .

"She has to come into court now and be labeled a liar and have her whole personal life displayed to satisfy the burden to prove the defendant beat them up. But that's what we have to do, and that's what we do and we did that.

"I don't have much to go on. It is what it is, as we say around here.

"I would love Polly Purebred to be my victim who would tell the same story every single time, but it is what it is.

"Emmalyn is who she is."

In short, the prosecutor made no attempt to hide Munjar's lies from the jury. Instead, he was forthright about the many inconsistencies in her testimony and the fact that her story was constantly changing. This was bolstered by defense counsel's cross-examination of Munjar and her closing argument, which further drove home the fact of Munjar's perjury. In light of this, we cannot agree the prosecutor committed misconduct.

Even if we were to conclude otherwise, the record does not show defendant suffered prejudice. (*People v. Adams* (1993) 19 Cal. App. 4th 412, 427 [no reversal if failure to disclose false testimony was harmless beyond a reasonable doubt].) The jury acquitted defendant of the sole charge in which Munjar was the named victim, suggesting it did not believe her testimony. The counts on which defendant was convicted all involved Chow, and his testimony provided ample, independent support for those convictions.

*Id.*

### b.    Applicable Federal Law

Prosecutorial misconduct is cognizable in federal habeas corpus: "the appropriate standard of review for such a claim . . . is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks

omitted).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair.  *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (noting, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor).

When a prosecutor obtains a conviction by the use of testimony that he knows or should know is perjured, it has been consistently held that such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury.  *See United States v. Agurs*, 427 U.S. 97, 103-07 (1976).  The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  If the prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts.  *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).  However, prosecutors will not be held accountable for discrepancies in testimony where there is no evidence from which to infer prosecutorial misconduct and the fairness of the trial was not materially affected.  *See United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (no evidence of prosecutorial misconduct where discrepancies in testimony could as easily flow from errors in recollection as from lies).  In sum, to prevail on a claim based on *Agurs/Napue*, the petitioner must meet these three requirements under *Hayes v. Brown* by showing that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material."  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (omission in original)).  "Material" means that there is a reasonable likelihood that the false evidence or testimony could have affected the judgment of the jury.  *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006).

### c.    **Analysis**

Here, Petitioner fails to make the necessary showing for a due process violation.  First, Petitioner fails to submit any evidence that Munjar's testimony was actually false or that the prosecutor knew or should have known the testimony was false—the first and second *Hayes* requirements.  It seems that because Munjar offered conflicting accounts to the police at the

preliminary hearing and at the first and second trials, Petitioner makes a conclusory argument that she was lying at the second trial. However, Petitioner's conclusory claim that Munjar lied on the stand at the second trial does not establish a knowing presentation of perjury by the prosecution. *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004) (Petitioner must establish a factual basis for attributing knowledge that the testimony was perjured to the government.); *Zuno-Arce*, 44 F.3d at 1423 ("Lawyers in criminal cases, for prosecution and defense, sometimes swim in a sea of lies, and must necessarily trust the jury to determine what is true, or whether reasonable doubt remains about what is true."); *Tapia v. Tansy*, 926 F.2d 1554, 1563 (9th Cir. 1991) ("Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony."). Specifically, the state appellate court reasonably rejected Petitioner's allegation that the prosecutor knowingly suborned Munjar's perjury upon pointing out that it was not evident which version of her testimony was the truth, and noted as follows:

> . . . other than instances where Munjar's testimony was contradicted by telephone and text records, we have no way of knowing what testimony was truthful. It could be that her early versions were false, such that her testimony at the second trial was the truth. It could be that her early versions were false, such that her testimony at the second trial was the truth.

*Kennedy*, 2014 WL 7183288, *15. Furthermore, the record shows that the prosecutor pointed out Munjar's inconsistencies and explained why he believed Munjar's testimony from the previous trial was false, stating that, "especially in domestic violence, you see victims of crime will often say, 'I don't want to be hurt, but I still love and care for him,'" and that Petitioner had called Munjar 56 times to try to get her to lie about his actions. 16 RT 3344. The state appellate court reasonably concluded as follows:

> Munjar testified at the second trial she lied previously because defendant asked her to and she was afraid, she did not want him to get in trouble, and she did not want Chow to find out she had had sex with defendant the day before the incident. The record thus does not support defendant's claim that Munjar's conflicting testimony at the second trial necessarily constituted perjury.

*Kennedy*, 2014 WL 7183288, *15. Under such circumstances, this was not a situation where the prosecutor obviously should have known that the testimony in the second trial was actually false.

34

Thus, the state appellate court reasonably concluded that Petitioner failed to establish the first two *Hayes* requirements, because he did not demonstrate that, aside from the testimony that could be verified or impeached by phone and text records, Munjar's current trial testimony was verifiably false and the prosecutor knew or should have known that it was false. *See id.*

Even if Petitioner could have met his burden as to the first two *Hayes* requirements, the Court finds that the state appellate court reasonably concluded that evidence here was not material—the third *Hayes* requirement. As discussed above, Munjar's statements at Petitioner's second trial were subjected to impeachment. Moreover, as explained above, the state appellate court pointed out that the prosecutor made no attempt to hide Munjar's lies from the jury by acknowledging in his closing argument that Munjar was a liar and that the inconsistent testimony should not be taken at face value. *Id.* at *16. In addition, defense counsel repeatedly attacked and emphasized the inconsistencies in Munjar's testimony. *Id.* Further, as the state appellate court noted, "The jury acquitted [Petitioner] of the sole charge in which Munjar was the named victim, suggesting it did not believe her testimony. The counts on which [Petitioner] was convicted all involved Chow, and his testimony provided ample, independent support for those convictions." *Id.* at *17. Furthermore, the record shows that Chow's testimony contradicted Petitioner's claim that he was trying to attack Chow in order to defend Munjar. Chow testified that he was asleep when Petitioner entered the apartment. 12 RT 2665-2666. Chow also testified that he saw Petitioner trying to choke Munjar. 12 RT 2674. A neighbor also heard a male argue with a woman and yell, "Are you fucking him?" several times. 13 RT 2827-2830, 2840. Respondent also points out that the "severity and duration of Petitioner's attack on Chow, an older man with Parkinson's disease who was barely awake and sometimes unconscious, further suggests that petitioner's motive was not protection of Munjar." Dkt. 24-1 at 30-31 (citing 12 RT 2666-2675). Thus, Respondent argues that "[e]ven if Munjar's testimony were completely dismissed as discredited, all of the remaining evidence pointed against Petitioner's 'defense of others' theory, such that a reasonable jury would have to reject this defense." This Court agrees with Respondent and finds that the state appellate court reasonably concluded that any error from the prosecutor's failure to draw even more attention to Munjar's inconsistencies had no effect on the verdict and

therefore was not material.

Accordingly, Petitioner is not entitled to habeas relief on Claim 2.

### 3. Insufficiency of the Evidence (Claim 3)

Petitioner contends that insufficient evidence supported the conviction of battery with serious bodily injury and the great bodily injury enhancement. Dkt. 20 at 5.

### a. State Court Opinion

The state appellate court described the factual background on this claim and rejected it as follows:

> The jury convicted defendant of battery with serious bodily injury and found true the section 12022.7 great bodily injury enhancement on all three charges involving Chow. Defendant contends there was insufficient evidence to support these findings "since the injuries suffered by Chow were not sufficiently serious, significant or substantial to meet the requisite statutory definitions." We disagree.
>
> Section 12022.7, subdivision (a), provides for a three-year enhancement for a defendant who inflicts great bodily injury on another person, other than an accomplice, during the commission of a felony. "Great bodily injury" and "serious bodily injury" have substantially the same meaning. (*People v. Hawkins* (1993) 15 Cal. App. 4th 1373, 1375.) Section 243, which sets forth the punishment for the crime of battery when committed under various circumstances, defines "'[s]erious bodily injury'" as "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (§ 243, subd. (f)(4); see also CALCRIM No. 925 [battery causing serious bodily injury].) We easily find substantial evidence that Chow suffered qualifying injuries.
>
> To begin with, the uncontroverted evidence showed that Chow suffered a "left orbital blowout fracture." As expert witness Emerson described it, the lower and side portions of his eye socket were shattered, there were bone fragments in the muscle and muscle trapped within the bone fragments, and Chow's eye was swollen shut. Chow testified that he continued to experience vision deficits in his left eye as a result of his injury. This alone was sufficient to support the jury's finding. But there was more. Chow also testified he lost consciousness during the assault, and he suffered multiple lacerations requiring sutures and a broken nose. The jury could reasonably conclude these injuries fell within the scope of serious or great bodily injury. (*See, e.g., People v. Belton* (2008) 168 Cal. App. 4th 432, 440 [loss of tooth, which victim could not replace due to lack of insurance, and wounds requiring sutures on eyebrow and mouth constituted sufficient "'serious impairment of . . . physical condition'" to support conviction for battery with serious bodily injury]; *People v. Muniz*

(1989) 213 Cal. App. 3d 1508, 1520 [extensive bruises, severely swollen eye]; *People v. Corona* (1989) 213 Cal. App. 3d 589, 592 [swollen jaw, bruises to head and neck, cut above eye requiring stitches]; *People v. Sanchez* (1982) 131 Cal. App. 3d 718, 733 [multiple abrasions, lacerations, swelling and bruising to eye and cheek].)

Defendant attempts to undermine this evidence by pointing out that Chow previously stated he did not lose consciousness; his lacerations were "small" and did not require extensive suturing; a "Dr. Chung" testified at the first trial that Chow was "'evaluated for a [sic ] orbital fracture'"; and Chow checked himself out of the hospital against medical advice and never sought further medical care. Dr. Chung testified at the first trial, but not the second. His testimony is therefore irrelevant to the serious bodily injury finding at the second trial. Beyond that, the evidence to which defendant points was before the jury, and it was up to the jury to determine whether all of the evidence established serious bodily injury beyond a reasonable doubt. (*People v. Escobar* (1992) 3 Cal. 4th 740, 750.) It found that it did, the evidence defendant identifies notwithstanding. And it is not our role to reweigh the evidence or reevaluate a witness's credibility; we are merely tasked with determining whether the jury's finding was supported by substantial evidence (*ibid.*), and we conclude it was.

*See Kennedy*, 2014 WL 7183288, *17-18.

### b.     Applicable Federal Law

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be characterized fairly as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim, which, if proven, entitles him to federal habeas relief. *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing a state court conviction collaterally does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference. *Jackson*, 443 U.S. at 326. If confronted with a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the

37

United States District Court
Northern District of California

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *Jackson*, 443 U.S. at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam). In reviewing habeas petitions, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). Thus, after AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). To grant relief, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 965 (9th Cir. 2011).

Sufficiency of the evidence claims are reviewed with reference to the substantive elements of the criminal offense as defined by the state law. *Jackson*, 443 U.S. at 324 n.16.

### c.    Analysis

Petitioner has failed to demonstrate that the state appellate court's determination was an unreasonable application of Supreme Court authority. The state appellate court reasonably concluded that sufficient "uncontroverted evidence" existed to support the jury's finding of the serious bodily injury element beyond a reasonable doubt. *See Kennedy*, 2014 WL 7183288, *17.

The particular statute relied upon by the state courts, California Penal Code § 243(f)(4), defined serious bodily injury as encompassing "loss of consciousness," "bone fracture," or "a wound requiring extensive suturing," omitting any limitation requiring a prolonged or protracted injury. *See* Cal. Penal Code § 243(f)(4). The state appellate court reasonably concluded that it could "easily find substantial evidence that Chow suffered qualifying injuries." *Kennedy*, 2014

38

WL 7183288, *17. A CT scan demonstrated that Chow suffered from a "left orbital blowout fracture," and an expert witness noted that there were bone fragments trapped in the muscle around the shattered eye socket and ongoing vision deficits. 13 RT 2873-2878. Under the statutory definition of "serious bodily injury," a "bone fracture" alone would have been sufficient to qualify as a serious bodily injury. Cal. Penal Code § 243(f)(4). Moreover, "protracted loss or impairment of function"—such as Chow's testimony that he suffered from ongoing vision blurriness in his left eye, 12 RT 2678, 2680—is also explicitly listed as one type of serious bodily injury. *See* Cal. Penal Code § 243(f)(4). Furthermore, the state appellate court noted that Chow testified that "he lost consciousness during the assault, and he suffered multiple lacerations requiring sutures and a broken nose." *Kennedy*, 2014 WL 7183288, *17. Specifically, Chow received eight stitches on his upper lip, 14 stitches on his lower left lip, and six to seven stitches above his left eye. 12 RT 2721-2722. Therefore, the state appellate court determined that "[t]he jury could reasonably conclude these injuries fell within the scope of serious or great bodily injury." *Kennedy*, 2014 WL 7183288, *17. Therefore, the Court finds unavailing Petitioner's claim that Chow's injuries were not sufficiently serious, significant or substantial to meet the requisite statutory definitions.

Furthermore, the state appellate court reasonably upheld the jury's findings notwithstanding the testimony of "Dr. Chung" or Chow's decision to leave the hospital early. *Kennedy*, 2014 WL 7183288, *18. As the state appellate court noted, Dr. Chung testified only in the first trial, so that testimony was irrelevant to the question whether there was sufficient evidence in the second trial to support a great bodily injury finding or battery with serious bodily injury conviction. *Id.* Moreover, Chow's decision to leave the hospital and not seek further medical attention did not foreclose the jury from concluding that Chow's injuries were serious. Finally, regardless whether a more detailed medical opinion on the seriousness of injury was available, the state appellate court reasonably concluded that the jury could make a reasonable, common sense determination that the bone fracture, lip and eye injuries requiring extensive stitches, broken nose, and loss of consciousness (or any combination of the above) constituted "serious" or "great" injuries within the scope of the type of injuries listed in California Penal Code

§ 243(f)(4).

In sum, viewing the evidence in the light most favorable to the prosecution, Petitioner has failed to show that no rational trier of fact could have found proof supporting the conviction of battery with serious bodily injury and the great bodily injury enhancement. *Jackson*, 443 U.S. at 324.

The Court finds objectively reasonable the state appellate court's rejection of Petitioner's due process claim alleging insufficient evidence supporting his conviction of battery with serious bodily injury and the great bodily injury enhancement. 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner is not entitled to habeas relief on Claim 3.

## V.     REQUEST FOR EVIDENTIARY HEARING

Respondent points out that Petitioner argued in his original petition, but not in the first amended petition, that the Court should conduct an evidentiary hearing to obtain new evidence from Dr. Tony Lee Wong and Alecia Wei about the extent of Chow's injuries (relating to Claim 3). Dkt. 24-1 at 43 fn. 10 (citing Dkt. 1-4 at 6). The Court concludes that no additional factual supplementation is necessary, and that an evidentiary hearing is unwarranted with respect to Claim 3 or any of the claims raised in the instant petition.

For the reasons described above, the facts alleged in support of these claims, even if established at an evidentiary hearing, would not entitle Petitioner to federal habeas relief. Further, Petitioner has not identified any concrete and material factual conflict that would require the Court to hold an evidentiary hearing in order to resolve. *See Cullen v. Pinholster*, 563 U.S. 170 (2011). Therefore, Petitioner's request for an evidentiary hearing is DENIED.

## VI.    CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case.   For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (9th Cir. 2000). Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## VII. CONCLUSION

For the reasons outlined above, the Court orders as follows:

1. The petition is DENIED, and a certificate of appealability will not issue. Petitioner's request for an evidentiary hearing is DENIED. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2. The Clerk of the Court shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: March 11, 2019

_____
YVONNE GONZALEZ ROGERS
Now United States District Judge